**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STUART WOLLMAN, on behalf of himself and all other similarly situated stockholders of Hospitality Investors Trust, Inc., | Civil Action No.: |
| Plaintiff, | **JURY TRIAL DEMAND** |
| v. | |
| HOSPITALITY INVESTORS TRUST, INC.; AR GLOBAL INVESTMENTS, LLC; AMERICAN REALTY CAPITAL HOSPITALITY PROPERTIES, LLC; AMERICAN REALTY CAPITAL HOSPITALITY ADVISORS, LLC; NICHOLAS S. SCHORSCH; WILLIAM M. KAHANE; EDWARD M. WEIL, JR.; PETER M. BUDKO; BRIAN S. BLOCK; JONATHAN P. MEHLMAN; STANLEY R. PERLA; ABBY M. WENZEL; and ROBERT H. BURNS, | **CLASS ACTION COMPLAINT** |
| Defendants. | |

Plaintiff, by and through his attorneys, alleges as follows based on personal knowledge as to himself and on information and belief as to other matters. Plaintiff's information and belief is based on the investigation of counsel, including a review of documents filed by Hospitality Investors Trust, Inc. ("HIT" or the "Company"), formerly known as American Realty Capital Hospitality Trust, Inc., with the U.S. Securities and Exchange Commission ("SEC"), a Report of the Special Litigation Committee of the Board of Directors of Hospitality Investors Trust, Inc., dated October 11, 2019 (the "SLC Report"), news articles and other publicly available information.

## INTRODUCTION

1. HIT is a real estate investment trust ("REIT") formed by AR Capital, LLC ("AR Capital") owning a portfolio of hotel properties. HIT's common stock (the "Common Stock") was

sold to Plaintiff and other investors through a "reasonable best efforts" offering (the "Offering") conducted through a network of broker dealers licensed by the Financial Industry Regulatory Authority ("FINRA"). Realty Capital Securities, LLC ("RCS"), an AR Capital subsidiary (which has since filed for bankruptcy protection), served as the dealer-manager for the Offering.

2.     In connection with the Offering, Defendants engineered a scheme to sweep 1-2% of gross revenues from the hotels owned by the Company to American Realty Capital Hospitality Properties, LLC ("AR Hospitality"), which was controlled and indirectly owned by AR Capital, as a property management fee. However, AR Hospitality was doing nothing at all to earn those fees, and could not have performed the tasks with which it was charged, because AR Hospitality lacked the necessary personnel to perform the property management function for the hotels owned by HIT. Instead, the fees paid to AR Hospitality were viewed as a "deal term" in favor of AR Capital.

3.     Defendants' scheme to sweep 1-2% of the gross revenues from the hotels owned by HIT to AR Hospitality ran afoul of FINRA Rule 2310(b)(4)(B)(ii), limiting total underwriting fees to no more than the 10% of the Offering's gross proceeds (based on the Offering price of $25.00 per share), which the Offering documents filed by the Company with the SEC and provided to prospective investors referred to as "FINRA's 10% cap." Violating FINRA's 10% cap caused the terms of the Offering to be "presumed to be unfair and unreasonable" under FINRA rules. These facts were undisclosed and, had they been disclosed, Plaintiff and other HIT investors would not have purchased HIT Common Stock in the Offering and, indeed, any broker regulated by FINRA could not have solicited investors to purchase HIT Common Stock in the Offering.

4.     In addition to the deception and scheme relating to Defendants' fraudulent violation of FINRA's 10% cap, by early November 2015, at the latest, the Company was facing an imminent

liquidity crisis caused by RCS being under investigation by the Enforcement Section of the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the "Massachusetts Securities Division") for illegal conduct in connection with a proxy solicitation for another investment controlled by AR Capital. Had the imminent liquidity crisis or the underlying illegal conduct of RCS been disclosed, Plaintiff and other HIT investors would not have purchased HIT Common Stock in the Offering because, among other things, the liquidity crisis threatened to, and did, cause the Company to suspend paying the monthly cash distributions which had served as a major selling point for HIT Common Stock and because the underlying illegal conduct further tainted RCS-based investments.

5.      Plaintiff purchased shares of HIT Common Stock for $25.00 per share through the Offering in November 2015 and was forced to purchase additional shares of Common Stock through a dividend reinvestment plan (the "DRIP") after the Company initially encountered a liquidity crisis. Plaintiff has been damaged through Defendants' unlawful conduct. Plaintiff and other similarly situated investors are entitled to rescind those transactions or, in the alternative to receive damages based upon the decline in value of the Common Stock.

**PARTIES**

**Plaintiff**

6.      Plaintiff Dr. Stuart Wollman, on November 12, 2015, purchased 6,800 shares of HIT Common Stock in the Offering for $25.00 per share and, between May 2, 2015, and February 1, 2017, Plaintiff purchased 379.095 shares through the DRIP.

**Defendants**

7.      HIT is a Maryland corporation which maintains its corporate headquarters at Park Avenue Tower, 65 East 55th Street, Suite 801, New York, New York 10022. HIT is a REIT which conducts its operations through Hospitality Investors Trust Operating Partnership, L.P. (formerly

known as American Realty Capital Hospitality Operating Partnership, L.P.) (the "OP") and was formed to acquire primarily lodging properties in the midscale limited service, extended stay, select-service, upscale select-service and upper-upscale full-service segments within the hospitality sector.

8.     Defendant AR Global Investments, LLC ("AR Global"), is a successor in interest to AR Capital, which was formed in 2007 by Defendants Nicholas S. Schorsch ("Schorsch") and William M. Kahane ("Kahane").  AR Capital was majority owned by Defendant Schorsch and his wife, Shelley Schorsch, with the remaining interests owned by Defendants Kahane, Edward M. Weil, Jr. ("Weil"), Peter M. Budko ("Budko"), and Brian S. Block ("Block"), with an interest later being acquired by Jonathan P. Mehlman ("Mehlman").

9.     Defendant American Realty Capital Hospitality Properties, LLC (previously defined as "AR Hospitality") was controlled and indirectly owned by Defendant AR Capital, served as the Company's property manager, and was paid 4% of the Company's gross revenue plus an incentive fee of 15% of operating profits above 8.5% of HIT's investment pursuant to agreements that generally had a 20-year duration and could not be freely terminated by HIT.

10.     Defendant American Realty Capital Hospitality Advisors, LLC ("AR Advisors") was controlled and indirectly owned by Defendant AR Capital and served as the external manager of HIT until March 2017, for which it received, among other payments, cash asset management fees of $4.097 million, $18.004 million, and $4.581 million for 2015, 2016, and 2017, respectively, and acquisition and financing coordination fees of $48.062 million and $1.83 million for 2015, 2016, respectively.

11.     Defendant Nicholas S. Schorsch (previously defined as "Schorsch") is or was, together with his wife, the majority owner and a control person of Defendant AR Capital and was personally involved in creating the unlawful scheme which is the subject of this action.

12.     Defendant William M. Kahane (previously defined as "Kahane") is or was a member and a control person of Defendant AR Capital and, at the times relevant to this action, was the Executive Chairman of the Company's board of directors (the "Board").

13.     Defendant Edward M. Weil, Jr., owns or owned an interest in Defendant AR Capital, giving him an interest in AR Capital's subsidiaries, including AR Advisors and AR Hospitality.  Weil, as the Chairman of RCS at the times relevant to this action, was directly involved in soliciting the sale of the Company's Common Stock.

14.     Defendant Peter M. Budko owns or owned an interest in Defendant AR Capital, giving him an interest in AR Capital's subsidiaries, including AR Advisors and AR Hospitality. Budko served as CIO and a director of RCS at the times relevant to this action and was directly involved in soliciting the sale of the Company's Common Stock.

15.     Defendant Brian S. Block owns or owned an interest in Defendant AR Capital, giving him an interest in AR Capital's subsidiaries, including AR Advisors and AR Hospitality. Block, as a director of RCS at the times relevant to this action, was directly involved in soliciting the sale of the Company's Common Stock.

16.     Defendant Jonathan P. Mehlman (previously defined as "Mehlman"), at the times relevant to this action, was Chief Executive Officer ("CEO") of the Company and, in that capacity, either individually or through an attorney-in-fact, signed the Registration Statement of which the Prospectus forms a part (defined below in ¶¶ 22, 28).  Mehlman was also the CEO and President of AR Hospitality from December 2014 until March 2017 and received a 5% interest in AR

Hospitality and AR Advisors.  Through those interests, Mehlman received a portion of the funds paid by the Company in connection with the transactions complained of herein.

17.     Defendant Stanley R. Perla ("Perla") at the times relevant to this action was a Director of the Company and, in that capacity, either individually or through an attorney-in-fact, signed the Registration Statement of which the Prospectus forms a part.  Perla has also served as an independent director of American Finance Trust, Inc. (formerly known as American Realty Capital Trust V, Inc.) since April 2013.  Perla previously served as a trustee of American Real Estate Income Fund from May 2012 until August 2016, and as an independent director of American Realty Capital Global Trust II, Inc., from August 2014 until January 2016.  Perla has received significant compensation for serving as an "independent" director of AR Capital related funds, including: $168,619 from HIT and $562,342 from American Finance Trust, Inc., in 2018; $259,067 from HIT and $143,747 from American Finance Trust, Inc., in 2017; $276,725 from HIT and $226,622 from American Finance Trust, Inc., in 2016; $109,949 from American Finance Trust, Inc.,$98,292 from American Realty Capital Global Trust II, Inc., and $166,165 from HIT in 2015; $90,750 from American Realty Capital Trust V, Inc., $40,375 from American Realty Capital Global Trust II, Inc., and $152,301 from HIT in 2014; and, $96,500 from American Realty Capital Trust V, Inc., and $111,362 from American Realty Capital Daily Net Asset Value Trust, Inc., in 2013.

18.     Defendant Abby M. Wenzel ("Wenzel") at the times relevant to this action was a Director of the Company and, in that capacity, either individually or through an attorney-in-fact, signed the Registration Statement of which the Prospectus forms a part.  Wenzel also served as a director of American Realty Capital Trust IV, Inc., from May 2012 until the close of the merger of American Realty Capital Trust IV, Inc., with American Realty Capital Properties, Inc. (n/k/a

VEREIT, Inc., "VEREIT") in January 2014.  Wenzel received $166,119 from HIT in 2018. Wenzel has received significant compensation for serving as an "independent" director of AR Capital related funds, including: $116,119 from HIT, $117,855 from New York City REIT, $214,301 from Global Net Lease, Inc., in 2018; $242,942 from HIT, $230,270 from Global Net Lease, Inc., and $100,995 from American Realty Capital New York City REIT, Inc., in 2017; $242,725 from HIT, $96,774 from American Realty Capital New York City REIT, Inc., $235,853 from Global Net Lease in 2016; $ 619,589 from Global Net Lease, $97,943 from American Realty Capital New York City REIT, Inc., $95,248 from HIT in 2015; $52,743 from American Realty Capital New York City REIT, Inc., and $101,500 from American Realty Capital Global Trust, Inc., $58,708 from Cole Credit Property Trust V, Inc., and $133,625 from HIT in 2014; and, $77,750 from American Realty Capital Global Trust, Inc., in 2013.

19.     Defendant Robert H. Burns ("Burns") at the times relevant to this action was a Director of the Company and, in that capacity, either individually or through an attorney-in-fact, signed the Registration Statement of which the Prospectus forms a part.  Burns was a director of several other AR Capital-affiliated REITs, including New York REIT, Inc., American Realty Capital Global Trust II, Inc., American Realty Capital Healthcare Trust, Inc., American Realty Capital Trust III, Inc., American Finance Trust, Inc., and American Realty Capital Trust, Inc. Burns has received significant compensation for serving as an "independent" director of AR Capital related funds, including: $100,093 from HIT in 2017; $244,997 from New York REIT, Inc., and $141,177 from HIT in 2016; $240,218 from New York REIT, Inc., $119,798 from HIT and $101,657 from American Realty Capital Global Trust II, Inc., in 2015; $50,250 from American Realty Capital Trust V, Inc., $587,199 from New York REIT, Inc., $62,493 from HIT in 2014; $84,500 from New York REIT, Inc., $198,750 from American Realty Capital Healthcare Trust

Inc, $106,750 from American Realty Capital Trust V, Inc., in 2013; $111,250 from American Realty Capital Healthcare Trust Inc and $73,00 from American Realty Capital New York Recovery REIT Inc in 2012; $118,362 from American Realty Capital Trust, Inc., $30,000 from American Realty Capital Trust III, Inc., and $94,667 from American Realty Capital New York Recovery REIT Inc in 2011; and, $60,000 from American Realty Capital Trust, Inc., and $30,000 from American Realty Capital New York Recovery REIT Inc, $89,700 from American Realty Capital Trust, Inc., in 2009.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) proposed class members are citizens of a State different from any defendant, and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

21.     Venue is proper pursuant to 28 U.S.C. §1391 because HIT is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## SUBSTANTIVE ALLEGATIONS

**The Company**

22.     HIT was incorporated on July 25, 2013, as American Realty Capital Hospitality Trust, Inc., by its sponsor, American Realty Capital IX, LLC, which was owned and controlled directly or indirectly by AR Capital.

23.     On December 6, 2013, the Board, then including Defendants Schorsch and Wenzel, approved the form of a property management agreement providing for the payment of 4% of gross revenues to AR Hospitality.

24.     On January 7, 2014, the Company commenced the Offering on a "reasonable best efforts" basis of up to 80,000,000 shares of Common Stock at a per share price of up to $25.00 (including the maximum allowed to be charged for commissions and fees, subject to certain discounts), pursuant to a prospectus filed as part of a registration statement filed on Form S-11 (the "Registration Statement") with the SEC, as amended.  To participate in the Offering, investors completed and signed a subscription agreement providing that all rights thereunder were governed by the laws of the State of New York, without giving effect to the principles of conflicts of laws.

25.     Selling commissions and dealer manager fees pursuant to the Offering were disclosed to be $2.50 per share, or 10% of the public offering price of primary shares—the maximum allowed to be charged for commissions and fees pursuant to FINRA's 10% cap.  Those fees were further disclosed in the Prospectus to consist of $1.75 in selling commissions and $0.75 in dealer manager fees, subject to certain volume discounts to purchasers on orders of more than $500,000, which reduced the selling commission without affecting proceeds to the Company.

26.     On February 3, 2014, the Company began declaring distributions payable to stockholders of record each day during the applicable period at a rate equal to $0.00465753425 per share per day, or $1.70 per annum, on a monthly basis (the "Monthly Distribution").

27.     On May 23, 2014, the Company entered into an agreement to acquire real property interests in 126 hotels from a series of special purpose entities owned by W2007 Grace I, LLC and WNT Holdings, LLC (the "Grace Entities"), which were indirectly owned by one or more Whitehall Real Estate Funds, an investment arm controlled by The Goldman Sachs Group, Inc. ("Goldman Sachs").  The contract purchase price was approximately $1.925 billion exclusive of closing costs and subject to certain adjustments at closing.  The Company was required to make a $50.0 million earnest money deposit, with an additional $25.0 million due if the Company

exercised its right to extend closing of the acquisition to December 15, 2014. The full amount of this deposit was to be refunded to the Company if the agreement was terminated by the Company prior to the end of a sixteen-day due diligence period that expired on June 8, 2014.

28.    On November 11, 2014, the Company's agreement with the Grace Entities was amended to, among other things, reduce the number of hotels to be acquired from the Grace Entities to 116 (the "Grace Properties") for an aggregate purchase price of $1.808 billion, exclusive of closing costs and subject to certain adjustments at closing.

29.    On February 27, 2015, the Company, through indirect subsidiaries of its OP, closed on the acquisition of the Grace Properties. HIT, however, lacked the necessary financial resources to pay for the purchase and, accordingly, in order to fund the purchase, the Company issued to the sellers' affiliates preferred equity interests (the "Grace Preferred Equity Interests") in two newly-formed Delaware limited liability companies, ARC Hospitality Portfolio I Holdco, LLC (which issued approximately $347.3 million of preferred equity interests) and ARC Hospitality Portfolio II Holdco, LLC (which issued approximately $99.8 million of preferred equity interests), each of which is an indirect subsidiary of the Company and an indirect owner of the Grace Properties.

30.    The Grace Preferred Equity Interests' holders were entitled to monthly distributions at a rate of 7.50% per annum for the first 18 months following closing and 8.00% per annum thereafter. The Company was required to redeem 50% of the preferred equity interests by February 27, 2018, and 100% of the preferred equity by no later than February 27, 2019. If HIT proved unable to satisfy the redemption, distribution or other requirements of the preferred equity, then the Grace Preferred Equity Interests' holders would be able to, among other things, assume control of the operations of the Grace Properties.

**The Prospectus Omitted to State Material Facts Which**
**Would Have Prevented the Sale of HIT Stock in the Offering**

31.     On April 30, 2015, the Company filed a new prospectus on Form 424B3 (the "Prospectus"), dated April 28, 2015, with the SEC.  The key selling points for the Company's Common Stock were the Monthly Distribution plan, which was akin to a monthly dividend, and a planned exit from the investment within a three-to-six-year time period from the end of the offering, which was expected to be on January 7, 2016.

32.     Despite representing in a Form of Management Agreement by and between American Realty Capital Hospitality TRS Subsidiary and American Realty Capital Hospitality Properties, LLC that formed part of the Registration Statement that it "is experienced and capable in the promotion, management, and operation of first-class hotels," AR Hospitality appeared to exist solely on paper and to be patently unqualified to perform the activities that it agreed to perform under that agreement.

33.     At the time of the Prospectus, HIT already had more than two months of operating experience (since the closing on the Grace Properties' acquisition), during which time Defendant AR Hospitality failed to perform any meaningful tasks associated with management of the Company's properties.  In addition, AR Hospitality did not have, and was not taking, any steps to employ the necessary personnel in order to perform meaningful tasks associated with management of the Company's properties.  Instead, Defendants viewed and knew or recklessly disregarded that the fees being paid to AR Hospitality were a "deal term" designed to surreptitiously provide additional revenue to AR Capital through AR Hospitality in a scheme engineered by Defendants Schorsch, Kahane and AR Capital.

34.     The Prospectus failed to disclose this "deal term" or that AR Hospitality lacked the ability, and was not making any plans to gain the ability, to function as a property manager.

Instead, the Prospectus falsely stated that the total underwriting commissions associated with the Offering were $2.50 per share, or 10% of the Offering price of $25.00 per share, purportedly complying with "FINRA's 10% cap."

35.     In addition, the Prospectus failed to disclose that FINRA rules provided that, because the 10% cap had been violated, the terms of the Offering were "presumed to be unfair and unreasonable." That was a material fact which would have caused Plaintiff and other HIT investors not to have participated in the Offering. Indeed, disclosing that fact would have caused any broker registered with FINRA to decline to solicit the sale of HIT shares in the Offering. Since almost all, if not all, the brokers selling Common Stock in the Offering were registered with FINRA, this means that the Offering could not have taken place with the undisclosed "deal term" in place.

**Defendants Fail to Disclose Illegal Conduct and the Resulting Liquidity Crisis**

36.     The Company was dependent upon proceeds from the Offering to support its liquidity needs, including completing the acquisition of hotels for which the Company had previously contracted, paying for needed property improvements and paying the Grace Preferred Equity Interests' holders.

37.     In October 2014, an accounting scandal involving an AR Capital-sponsored REIT, American Realty Capital Properties, Inc. ("ARCP"), became publicly known. The ARCP accounting scandal involved knowingly misrepresenting a key metric used to evaluate ARCP's financial performance. The scandal eventually led to Defendant Block, a senior AR Capital executive, being convicted, in June 2017, of securities fraud charges brought by the U.S. Attorney's Office for the Southern District of New York, and to AR Global, AR Capital's successor, and other defendants agreeing to collectively pay more than *$1 billion*, in late 2019, to settle a civil securities fraud class action brought on behalf of ARCP investors.

38.     AR Capital denied knowledge or responsibility for the ARCP accounting scandal. Nonetheless, the scandal caused many broker-dealers to avoid doing business with or selling investments sponsored by AR Capital, such as HIT's Common Stock being sold in the Offering.

39.     On November 12, 2015, the Massachusetts Securities Division filed an administrative complaint against RCS for engaging in fraudulent voting on proxies issued by other AR Capital-affiliated entities and seeking, among other things, to revoke its broker-dealer registration in Massachusetts.   The Massachusetts Securities Division began investigating this unlawful conduct by no later than July 2, 2015, when it met with a concerned RCS employee.

40.     Once these facts were disclosed, investors no longer wished to do business with AR Capital-affiliated companies, or purchase securities in AR Capital controlled entities such as HIT, or at least were unwilling to do so on the same or similar terms as with entities that had untarnished reputations.   Thus, owing at least in part to the Massachusetts Securities Division's investigation, on November 8, 2015, AR Capital and an affiliate of Apollo Global Management, LLC ("Apollo") terminated an agreement in which Apollo would have purchased a 60% interest in AR Capital's assets by acquiring a controlling interest in AR Global.

41.     Similarly, on November 17, 2015, the Company filed with the SEC Supplement No. 7 to the Prospectus, dated November 16, 2015, disclosing that the Massachusetts Securities Division's allegations of fraudulent proxy solicitations by RCS had led to a November 15, 2015, decision by the Company's Board suspending the Offering effective December 31, 2015.

42.     On or about December 2, 2015, RCS agreed to shut down nationwide and pay a $3 million fine to the Massachusetts Securities Division.

43.     On January 7, 2016, the Company filed Supplement No. 9 to the Prospectus with the SEC, disclosing among other things that:

Because our primary initial public offering was our primary source of capital to implement our investment strategy, reduce our borrowings, complete acquisitions, make capital expenditures and pay distributions, we may require funds in addition to operating cash flow to meet our current capital requirements. ***Our inability to meet our capital requirements could cause us to . . . default under our indebtedness*** and other obligations and otherwise have a material adverse effect on our business and results of operations. [Emphasis added.]

44.     The Company's inability to raise funds, caused by the Massachusetts Securities Division filing its complaint against RCS, caused an immediate liquidity crisis. Thus, by December 8, 2015, the Company's non-management directors selected Hentschel & Company as their financial advisor for the purposes of identifying strategic alternatives to HIT's liquidity crisis.

45.     The liquidity crisis had an immediate impact on the value of Plaintiff's investment, as the Company's failure to obtain financing alternatives to the Offering caused HIT, in December 2015, to forfeit $19.1 million in earnest money deposits with respect to 15 hotels. In January 2016, HIT was forced to forfeit an additional $22.0 million in earnest money deposits with respect to nine hotels.

**Defendants Sell Additional Shares of the Company at an Inflated Price**

46.     On March 28, 2016, the Company disclosed that because it did not expect it would resume the IPO that it required funds, in addition to operating cash flow and cash on hand, to meet its capital requirements. As a result, beginning in April 2016, the Company would pay the $1.70 per share per annum Monthly Distribution in shares of unsaleable Common Stock, instead of cash, in an amount equivalent to $1.70 per annum, divided by $23.75.

47.     On July 1, 2016, the Board approved an estimated net asset value ("NAV") per share of Common Stock equal to $21.48 for the 36,636,016 shares of Common Stock outstanding on a fully diluted basis as of March 31, 2016. The $21.48 price was used from that time forward for the forced share purchases made through the Monthly Distribution.

48.     However, both the $23.75 and $21.48 per share prices at which Plaintiff was forced to purchase additional shares (in lieu of a cash dividend) did not accurately reflect the Common Stock's value.  Thus, on January 12, 2017, HIT, along with the OP, entered into a Securities Purchase, Voting and Standstill Agreement (the "SPA") with Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC (the "Brookfield Investor") through which the Company obtained $135.0 million in funding.  At a value of $14.75 per unit, Brookfield Investor acquired OP's Class C units, which were convertible into OP's units at $14.75, subject to anti-dilution and other adjustments, and OP units, in turn, were generally redeemable for the Company's Common Stock on a one-for-one-basis.  Thus, this transaction represented an over 31% discount to the most recent per share NAV of $21.48 reported by the Company only six months earlier in July 2016.

49.     On June 19, 2017, the Board approved, and HIT disclosed in a Form 8-K filed with the SEC, a newly estimated NAV of Common Stock as being equal to $13.20 per share for the 39,617,676 shares of Common Stock outstanding on a fully diluted basis as of March 31, 2017.

50.     On April 23, 2018, the Board approved, and HIT disclosed in a Form 8-K filed with the SEC, a newly estimated NAV of Common Stock as being equal to $13.87 per share for the 39,505,742 shares of Common Stock outstanding on a fully diluted basis as of December 31, 2017.

51.     The Company's NAV, however, has been fictional because Plaintiff's and Common Stockholders' first opportunity to sell their shares came in response to a mini-tender offer made by MacKenzie Capital Management, L.P. on May 7, 2018, for up to 300,000 shares at $7.05 per share.  This was followed by HIT's filing on May 14, 2018, a Schedule TO with the SEC for a competing self-tender offer to purchase up to 1,000,000 shares of Common Stock for $7.05 per share, representing an almost 50% discount from the then-stated, significantly reduced, NAV.

52.     On May 9, 2019, the Board approved, and on May 13, 2019, HIT disclosed in a Form 8-K filed with the SEC, a newly estimated NAV of Common Stock as being equal to $9.21 per share for the 39,134,628 shares of Common Stock outstanding on a fully diluted basis as of December 31, 2018.

53.     In September 2019, Central Trade & Transfer, a secondary market for non-traded REITs, listed shares of HIT for $5.00 per share.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of a class (the "Class") consisting of all persons who purchased HIT Common Stock issued pursuant to the Offering or DRIP at any time since April 30, 2015. Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and their successors in interest, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

55.     Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add subclasses, if necessary, before this Court determines whether certification is appropriate.

56.     The Class is so numerous that joinder of all members is impracticable.  The Company reported in an SEC filing that as of May 9, 2019, there were 39,134,628 shares of Common Stock outstanding.  Consequently, the number of Class members is believed to be in the hundreds or thousands.

57.     There are questions of law and fact that are common to the Class members and that predominate over any questions affecting only individuals, including, but not limited to:

        a.      whether Defendants knew or recklessly disregarded that underwriting commissions paid in connection with the Offering exceeded the 10% FINRA cap:

b.      whether Defendants had a duty to disclose that the underwriting commissions paid in connection with the Offering exceeded the 10% FINRA cap;

c.      whether Defendants omitted material facts relating to the unlawful conduct and impending liquidity crisis at HIT;

d.      whether Defendants engaged in a scheme or conspiracy designed to defraud Plaintiff and other members of the Class or, alternatively, whether they rendered knowing substantial assistance to the underlying scheme to fraud; and

e.      whether Plaintiff and the other members of the Class are entitled to a rescission or, alternatively, what is the proper measure of damages.

58.     Plaintiff's claims and defenses are typical of those of other Class members and Plaintiff has no motives that are against the interests of all Class members.

59.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  In addition:

a.      Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of stockholders;

b.      There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c.      Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d.      Plaintiff's legal counsel has the financial and legal resources to prosecute this litigation.

60.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

61.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The interest of members of the Class in individually controlling the prosecution of separate actions is minimal, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  No other class action has been commenced by or against members of the Class to the best of Plaintiff's knowledge.  Claims should be concentrated in this forum because HIT is headquartered in New York County.  There will be no difficulty in the management of this action as a class action.

62.     It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## COUNT I

### Common Law Fraud

### (Against All Defendants)

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     Defendants acted in concert to sell Plaintiff's and other similarly situated investors' shares of HIT Common Stock through the Offering without disclosing relevant material facts.

65.     Defendants engaged in common action with a common purpose designed to conceal that payments being made to Defendant AR Hospitality were a deal term designed to serve as additional compensation to Defendant AR Capital for the sale and underwriting of HIT Common Stock in the Offering.

66.     The Company knew of the underlying scheme because, among other things, its officers and directors were involved directly in the scheme, it was the registrant for all Common Stock sold pursuant to the Registration Statement and the Prospectus, and because it and its sponsor, were owned and controlled, directly or indirectly, by the same individuals who controlled owned and controlled, directly or indirectly, AR Advisors and AR Hospitality.

67.     Defendants AR Capital, Schorsch and Kahane knew of the scheme to conceal the excess underwriting commissions for the HIT Common Stock sold in the Offering because they were the persons who conceived of and implemented the underlying scheme.

68.     Defendants Weil, Budko, Block, and Mehlman knew of the scheme based upon their close working relationship with Defendants Schorsch and Kahane, serving as senior executives or directors at multiple AR Capital entities including RCS, and because they own or owned an interest in Defendant AR Capital, giving them an interest in AR Capital's subsidiaries, including AR Advisors and AR Hospitality.

69.     Defendants Perla, Wenzel and Burns knew of or recklessly disregarded the scheme because as directors of HIT they had an obligation to inform themselves of the precise actions being taken by AR Hospitality in return for the fees being paid to AR Hospitality.

70.     Defendants were responsible for the contents of the Offering materials including the statements made in the Registration Statement and Prospectus, which concealed the existence of the unlawful scheme to exceed FINRA's 10% cap.

71.     Plaintiff and other members of the Class would not have purchased shares of HIT in the Offering had the underlying scheme been disclosed, including that its implementation caused the unwriting commissions paid to have been "unfair and unreasonable" under FINRA rules.

72.     Plaintiff and the Class reasonably and justifiably relied on the Offering complying with existing FINRA requirements including FINRA's 10% cap and would not have purchased HIT Common Stock at all, or at the prices they paid, had they known the true facts alleged above.

73.     The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiff and the members of the Class, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended by Defendants to mislead Plaintiff and the members of the Class.

74.     Plaintiff and the Class were misled, deceived and induced by Defendants to purchase HIT Common Stock which they would not otherwise have purchased.

75.     As a result of the conduct of Defendants, Plaintiff and the Class members have been damaged.  In addition to such damages, Plaintiff seeks punitive or exemplary damages pursuant to New York common law because Defendants' conduct under the subscription agreement and offering was actionable as an independent tort, was egregious in nature, and was directed to Plaintiff and the public generally.

76.     Plaintiff and the Class could not have discovered the true facts until at least such time as corrective information entered the market and thus, where a discovery rule is applicable,

Plaintiff's and the Class' cause of action did not begin to accrue until such time as corrective information placed them on notice of Defendants' fraud. Consequently, this action is timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests relief and judgment, as follows:

A.      Issuing an Order certifying this action as appropriate for class action treatment and appointing Plaintiff as a class representative;

B.      Awarding rescission or a rescissory measure of damages or, alternatively, compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.      Awarding Plaintiff punitive damages;

D.      Awarding Plaintiff his attorneys' fees and costs;

E.      Awarding including pre-judgment and post-judgment interest on all damages awarded; and

F.      Ordering such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: January 29, 2020

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

/s/  Jeffrey S. Abraham
    Jeffrey S. Abraham
    Michael J. Klein
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

**Attorneys for Plaintiff**