UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___6/18/2020___
```

-------------------------------------------------------------X

STUART WOLLMAN, on behalf of himself and         :
all other similarly situated stockholders of      :
Hospitality Investors Trust, Inc.,                :
                                                  :
                               Plaintiff,         :          20-CV-798 (VEC)
                                                  :
            -against-                             :          OPINION AND ORDER
                                                  :
                                                  :
HOSPITALITY INVESTORS TRUST, INC.; AR            :
GLOBAL INVESTMENTS, LLC; AMERICAN                 :
REALTY CAPITAL HOSPITALITY                        :
PROPERTIES, LLC; AMERICAN REALTY                  :
CAPITAL HOSPITALITY ADVISORS, LLC;                :
NICHOLAS S. SCHORSCH; WILLIAM M.                  :
KAHANE; EDWARD M. WEIL, JR.; PETER M.            :
BUDKO; BRIAN S. BLOCK; JONATHAN P.                :
MEHLMAN; STANLEY R. PERLA; ABBY M.                :
WENZEL; and ROBERT H. BURNS,                      :
                                                  :
                               Defendants.        :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        This is a direct shareholder action against Hospitality Investors Trust, Inc. ("HIT"), HIT's

external managers (the "AR Companies"), and several officers and directors.  *See* Compl. (Dkt.

1).  Plaintiff Stuart Wollman, an HIT shareholder, previously flirted with bringing a derivative

action, but he progressed no further than a demand on the Board.  Nevertheless, he has objected

to the settlement of a related derivative lawsuit captioned *Milliken v. American Realty Capital*

*Hospitality Advisors LLC*, No. 18-CV-1757 (VEC) (S.D.N.Y.).  In this case, Plaintiff alleges a

single count of common-law fraud against Defendants.  On March 18, 2020, Defendants moved

to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).  Mots.

(Dkts. 20, 26).  For the following reasons, Defendants' motions are GRANTED.[1]

## BACKGROUND[2]

HIT is a real estate investment trust incorporated in 2013 under the laws of Maryland.

Compl. ¶ 1, 22.  It does not have any employees, and it does not manage its properties or

financing.  Rather, various subsidiaries of Defendant AR Global Investments, LLC (successor in

interest to AR Capital, LLC) have externally managed HIT since its inception.  *Id.* ¶ 22.  Under

their operational and financial control, HIT purchases and manages hotel properties.  *Id.* ¶ 1.

In particular, American Realty Capital Hospitality Properties, LLC manages HIT's

properties (the "Property Manager"), *id.* ¶ 9, while American Realty Capital Hospitality

Advisors, LLC manages HIT's operations (the "External Manager"), *id.* ¶ 10.  Realty Capital

Securities, LLC ("RCS" or the "Dealer-Manager"), yet another affiliated company, managed

HIT's initial offering.  *Id.* ¶ 1.[3]

In 2015, HIT agreed to acquire a portfolio of hotel properties for approximately $1.8

billion, with periodic payments due on that acquisition through May 2019.  *Id.* ¶¶ 27–29.  To

raise capital necessary for the acquisition, HIT conducted a public offering over an extended

---

[1]     The Court will refer to the pleadings on HIT's motion to dismiss (Dkt. 20) as follows: HIT's memorandum of law in support of its motion (Dkt. 21) as "HIT's Mem. of Law"; Wollman's memorandum of law in opposition to HIT's motion (Dkt. 39) as "Pl.'s Opp."; and HIT's reply memorandum of law in further support of its motion (Dkt. 42) as "HIT's Reply."  Because HIT's motion substantially overlaps with the AR Companies' motion (Dkt. 26), the Court does not separately address the AR Companies' motion.

[2]     The facts are based on the allegations contained in the Complaint.  The Court accepts all well-pled, non-conclusory factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiff.  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

[3]     According to the Complaint, RCS has filed for bankruptcy; it is not named as a defendant in this action. Compl. ¶ 1.  The incestuous relationship among the parties was fully disclosed in the HIT offering materials.  Am. Realty Capital Hosp. Tr., Inc., Prospectus (Form 424B3) (Jan. 7, 2014), https://www.sec.gov/Archives/edgar/data/1583077/000114420414001599/v364866_424b3.htm.  The Court may take judicial notice of this prospectus.  *See infra*, note 4.

period of time at up to $25.00 per share. *Id.* ¶ 24. The intent was for investors to receive monthly cash distributions and a payout upon a planned exit from the investment within three-to-six years from January 7, 2016—the anticipated end of the offering. *Id.* ¶ 31. Plaintiff purchased shares in HIT on November 12, 2015. *Id.* ¶ 6.

The offering was disrupted that same day, however, when, after an extended investigation, the Massachusetts Securities Division filed an administrative complaint against RCS, the Dealer-Manager, in connection with unrelated conduct. *Id.* ¶ 39. A few weeks later, HIT suspended the offering and attempted unsuccessfully to finance its project through alternative means. *Id.* ¶¶ 40–43. HIT ended up in a liquidity crisis and forfeited approximately $40 million in earnest money deposits for the purchase of several hotels. *Id.* ¶¶ 44–45.

In connection with the public offering of shares, HIT represented that it (1) paid a management fee of 4% of revenues to the Property Manager and (2) paid total underwriting commissions at $2.50 per share to the Dealer-Manager. *Id.* ¶ 9, 34. (The underwriting commission maxed out FINRA's 10% cap on reasonable fees. *Id*. ¶ 34). According to the Complaint, however, a portion of the disclosed management fee was actually an undisclosed underwriting commission, thus exceeding what FINRA deems to be a fair and reasonable underwriting commission. *Id.* ¶¶ 3, 33–35.

Finally, the Complaint alleges that HIT "forced" Wollman to purchase additional shares in HIT at inflated prices by converting what were originally intended to be cash dividends into a stock dividends based on a share value of $21.48 per share. *Id.* ¶¶ 46–48. That share price, according to the Plaintiff, was based on a fictitious estimated net asset value ("NAV"). *Id.* ¶¶ 48–53.

On March 15, 2018, approximately two years before this lawsuit was commenced, Wollman sent a demand letter to HIT's Board of Directors describing similar claims, albeit ones

that Wollman characterized as derivative claims that he would pursue if HIT did not.[4]  SLC

Report at 14.  In his demand letter Wollman characterized the 4% fee for managing HIT's hotels

as an excessive management fee, not a hidden underwriting commission.  Demand Letter at 2.

He also complained of the hotel purchases that led to the $40 million earnest money deposits

forfeiture.  *Id.*  At oral argument on Defendants' motions to dismiss, Wollman asserted that facts

disclosed in the SLC Report caused him to determine that he actually has direct, not derivative,

claims.

## DISCUSSION

Wollman arguably advances three claims of fraud in his Complaint.  First, he alleges that

a portion of the disclosed property management fee that HIT paid to the Property Manager was,

in reality, an undisclosed and excessive underwriting commission for the Dealer-Manager.

Compl. ¶¶ 3, 33–35; Pl.'s Opp. at 9.  This is the only fraud theory that is actually alleged in

Count 1 of the Complaint.  Additionally, however, Wollman complains that HIT failed to

disclose a Massachusetts state investigation into the Dealer-Manager.  After the state filed a

complaint against the Dealer-Manager, investors fled HIT, which purportedly led to a liquidity

crisis and a $40 million forfeiture.  Compl. ¶¶ 6, 39–45; Pl.'s Opp. at 7–8, 12.  Third, Wollman

---

[4]      The Complaint incorporates by reference the Report of the Special Litigation Committee of the Board of Directors of HIT, dated October 11, 2019 ("SLC Report").  Compl. at 1; *see* Doyle Decl. (Dkt. 22) Ex. 1.  The SLC investigated allegations detailed in two demand letters to the Board: one from Wollman, *see* Doyle Decl. Ex. 5, and one from another shareholder, Thomas Milliken.  The Court may take judicial notice of the SLC Report.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("[the court] may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

Following his demand on the Board, Milliken filed a derivative action in this district, which is also assigned to the Undersigned.  *See Milliken v. Am. Realty Capital Hosp. Advisors, LLC*, No. 18-CV-01757 (VEC) (S.D.N.Y.).  A settlement in that case—largely driven by the findings of the SLC Report—is currently under review for final approval.  *See* Fed. R. Civ. P. 23.1.  On June 9, 2020, the Court held a fairness hearing; Wollman objected to the settlement on multiple grounds.

alleges that HIT's July 2016 estimated net asset value, which was used for the monthly stock distributions, was a "fictional" figure.  Compl. ¶¶ 15, 46–53; Pl.'s Opp. at 15.  The latter two theories make cameo appearances in the initial paragraphs of the Complaint but not in the portion titled Count 1.

## I.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  The Court, is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  Moreover, because Plaintiff's claim sounds in fraud, he must comply with Rule 9(b), which requires fraud claims to be pled with particularity.

## II.     Subject-Matter Jurisdiction

As a threshold matter, the Court must assess whether it has subject-matter jurisdiction. As the party invoking jurisdiction, Wollman bears the burden of establishing it.  *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).  In deciding a  motion to dismiss under Rule 12(b)(1), the court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  *Id.* (quotation omitted).  Plaintiff alleges that the court has jurisdiction based on the Class Action Fairness Act of 2005 ("CAFA").  28 U.S.C. §§

1332(d)(2), (6); Compl. ¶ 20; *see also Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir.

2006) (holding that "CAFA did not change the traditional rule and that plaintiff bears the burden

of establishing federal subject matter jurisdiction.").  Under CAFA, jurisdiction exists in cases

with "no fewer than 100 members of the plaintiff class, minimal diversity, and $5 million in

controversy." *Blockbuster, Inc.*, 472 F.3d at 57.

Defendants do not challenge Wollman's allegations of those basic jurisdictional facts,

and the Court sees no reason to question them.  They argue instead that Wollman's alleged class

is frivolous, and that is a sufficient basis on which to dismiss this case.  HIT's Mem. of Law at

22.  According to Defendants, adjudicating the alleged class's fraud claims would require

applying every state's laws, demonstrating that Wollman has no chance of meeting Rule 23(a)'s

requirements for class certification. *Id.* at 23.

Assuming, *arguendo*, that an obviously-noncertifiable class would be reason to grant a

Rule 12(b)(1) motion in a CAFA case,[5] the Court does not agree that the chance of certification

in this case is so far-fetched that Wollman's invocation of CAFA is frivolous or improper.  It is

not obvious at this stage that a nationwide class alleging fraud claims is patently unsustainable.

*See, e.g.*, *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 135-42 (S.D.N.Y. 2014) (certifying

national class alleging fraud claims where each state's laws applied).  Nor is there any indication

how many states' laws would in fact apply.  Defendants do not discuss the choice-of-law

provision in the agreement between HIT and its investors.  If that provision were to cover the

---

[5]     *See Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010) ("Frivolous attempts to invoke federal jurisdiction fail, and compels dismissal."); *Tropical Sails Corp. v. Yext, Inc.*, No. 14-CV-7582, 2017 WL 1048086, at *15–16 (S.D.N.Y. Mar. 17, 2017) ("[I]f a plaintiff invoked CAFA jurisdiction frivolously or defectively, federal jurisdiction would not exist.").

class's fraud claims (the Court is admittedly skeptical that it would), that would moot Defendants' concerns.

In short, the Court holds that Defendants have not overcome Plaintiff's assertion that this Court has subject-matter jurisdiction.

## III.    Shareholder Standing

Defendants first argue that Wollman lacks shareholder standing to bring his claims.[6] Under Maryland law, whether a claim is derivative or direct "must be determined from the nature of the wrong alleged and the relief, if any, that could result if the plaintiff were to prevail."[7] *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 346 (2009).  To assert a direct claim, the plaintiff "must have suffered a 'distinct injury' separate from any harm suffered by the corporation." *Oliveira v. Sugarman*, 451 Md. 208, 231 (2017).  A mere "decline in stock value does not give rise to a direct claim," and the remedy sought "must benefit the shareholder as an individual, not the corporate entity."  *Id.* at 231, 240; *see also Strougo v. Bassini*, 282 F.3d 162, 170–71 (2d Cir.

---

[6]     "Shareholder standing" is "a term used to describe the ability of a shareholder to seek redress for certain injuries on his or her own behalf rather than on behalf of the corporation."  *Strougo v. Bassini*, 282 F.3d 162, 167 n.4 (2d Cir. 2002) (citations omitted).

[7]     The parties dispute whether New York or Maryland law applies to the issue of shareholder standing. Because the Court's jurisdiction is based on diversity, the Court must "look to the laws of the forum state in deciding issues regarding conflicts of law."  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006).  Under New York law, courts "look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative."  *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015).  Because HIT is incorporated in Maryland, Maryland law applies.  Although HIT's agreement with its investors contains a choice-of-law provision selecting New York law, that provision does not supersede New York's choice-of-law rules regarding shareholders' standing to sue.  *See St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, No. 19-3078, 2020 WL 2147062, at *2 n.1 (2d Cir. May 5, 2020) (citing *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014), *certified question answered*, 118 A.3d 175 (Del. 2015)).

2002) (applying Maryland law) ("When the corporation is injured and the injury to its
shareholders derives from that injury . . . only the corporation may bring suit . . . .").

Although tenuous, Wollman has standing to assert his first claim.[8]  He parses a fine
distinction between the harm alleged in the Complaint versus the harm alleged in his previous
demand letter.  In this action, Wollman asserts that he would not have bought HIT stock in the
first place had he known that HIT was paying an undisclosed commission to the Dealer-
Manager.  That fact, according to Wollman, is probative of Defendants' trustworthiness.  By
contrast, his demand letter asserted a harm based on the diminution of HIT's NAV as a result of
paying excessive fees to a contractual third-party (described then as being a property
management fee).  In their motions to dismiss, that is how Defendants characterize (inaccurately)
the allegations in the Complaint.  The latter is a paradigmatic derivative injury, but the former—
Wollman's "fraudulent inducement" theory—is direct.

Maryland's highest court has held that "where a shareholder is cheated through
misrepresentation and fraud during a sale of stock . . . the right of action lies with the
stockholder." *Shenker*, 411 Md. at 346 (citing *Llewellyn v. Queen City Dairy, Inc.*, 187 Md. 49,
61 (1946)).  That rule follows from the principle that "the stock is the personal property of the
stockholder." *Id.*  Although *Llewellyn* involved shareholders selling stock, the same principle
applies to Wollman's purchase of HIT stock.  Defendants allegedly induced Wollman's
investment by misrepresenting its third-party relationships.  The fraudulently-induced purchase
itself led to Wollman's injury; his injury did not emanate from the diminished value of his
investment due to HIT or third-party mismanagement.  Wollman's injury is therefore distinct
from the harm caused to HIT from paying excessive fees.  Wollman's requested relief—

---

[8]        This appears to be a novel question of Maryland law.

rescission—further supports the conclusion that he is articulating a direct claim.[9]  Wollman requests rescission of his stock-purchase transaction.  *See* Compl. ¶¶ 5, B.  Rescission would return the entire value of the original investment to Wollman, not just the diminished value of his stock caused by HIT paying excessive fees.  That relief would flow to Wollman and away from HIT.

Finally, the policy considerations motivating Maryland's "direct injury" rule favor letting Wollman assert his claim directly.  The *Shenker* court explained that the rule requiring derivative lawsuits for injury to the corporation that incidentally results in damage to the shareholder "is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each."  *Shenker*, 411 Md. at 343 (quoting *Waller v. Waller*, 187 Md. 185, 189–90 (1946)).  Here, there is neither risk of a multiplicity of suits for the same injury, nor could the damages Wollman seeks be used to pay HIT's debts or be distributed to other shareholders.[10]  Wollman's alleged injury is unique to Wollman (and similarly situated

---

[9]     Rescission is an equitable remedy "to be invoked only when there is lacking complete and adequate remedy at law and where the Status quo may be substantially restored."  *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972).  The Court notes that Wollman appeared to modify his requested remedy in his opposition brief.  *See* Pl.'s Opp. at 21–22.  Instead of rescission, he discusses rescissory damages: the financial equivalent of rescission awarded when rescission is warranted but impractical.  *See Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*, 36 Misc. 3d 328, 344 (Sup. Ct. 2012) (explaining that rescission is impractical when it would either harm the policies' beneficiaries and the noteholders and would lead to greater economic harm or when it is "under governing transaction documents").

[10]     The Court acknowledges that the Alabama Supreme Court, applying Maryland law, appears to have reached a decision at odds with this holding.  In *Ex parte Regions Financial Corp.*, 67 So.3d 45, 52 (Ala. 2010), fund managers fraudulently induced the plaintiffs to buy shares in certain funds by misrepresenting the value of those funds.  "[T]he true value of the shares was allegedly much lower because of [mismanagement]."  *Id.* at 54. Although the majority held that Plaintiffs were raising a derivative claim, Justice Murdock dissented:

> The gravamen of the plaintiffs' claims is that the defendants misrepresented to them the nature of the investments that were held and would be held by the RMK funds, thus inducing the plaintiffs, as individuals, to invest (or to remain invested) in those funds.  The plaintiffs' claims are thus

shareholders who would not have purchased shares had they known that a portion of the disclosed 4% management fee was, in fact, an undisclosed underwriting commission).

Wollman's second claim, that he was damaged by HIT's failure to disclose the investigation into the Dealer-Manager of its public offering, is derivative. The Complaint alleges only that the eventual public disclosure of the investigation into RCS caused HIT to lose value, thus also causing Wollman's investment in HIT to lose value. In November 2015, the Massachusetts Securities Division filed a complaint against the Dealer-Manager for proxy voting fraud, threatening to revoke its registration as a broker-dealer. Compl. ¶ 39. HIT suspended its initial offering a few days later and sought alternative financing for its investments, but the stigma surrounding the Dealer-Manager allegedly scared potential investors in HIT away. *Id.* ¶¶ 40–41, 43. As a result, HIT suffered a liquidity crisis that led it to forfeit $40 million in earnest money deposits it had made in 24 hotels; that forfeiture, according to Wollman, "had an immediate impact on the value of Plaintiff's investment." *Id.* ¶ 45. Wollman fails to allege any distinct injury he sustained as a shareholder apart from HIT's lower NAV following the forfeiture.[11]

Finally, Wollman's third claim is direct. The Complaint alleges that HIT sold shares at inflated prices. *Id.* ¶¶ 48–53. The alleged harm to Wollman—overpaying for shares in HIT—is

---

different from claims of investors who suffered losses merely as a result of any mismanagement of the RMK funds.

*Id.* at 56. Justice Murdock's dissent, and this Court's decision, align with federal cases which, although not looking to Maryland law, similarly analyzed the nature of the harm in determining whether a claim is direct or derivative. *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 (S.D.N.Y. 2010); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 495 (S.D.N.Y. 2001); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1329 (S.D.N.Y. 1997).

[11]     At oral argument, Wollman tried to take a different tack more akin to his first claim. He stated that he would not have bought HIT stock had he known Massachusetts was going to file a complaint against the Dealer-

suffered by Wollman alone.  It does not stem from any corresponding injury to HIT, and the relief would go to Wollman only.

## IV.    Failure to State a Claim

Although at least two of the Complaint's three claims are direct, none is well pled.  The elements of fraud under New York law are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury."[12] *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).  Under Rule 9(b), Wollman must also plead fraud with particularity.  *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (the complaint must "state with particularity the specific facts in support of [the plaintiff's] belief that [the defendant's] statements were false when made").  To do so, he must "allege facts that give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Wollman's "fraudulent inducement" claim makes only conclusory assertions that fail *Twombly/Iqbal* and Rule 9(b)'s heightened pleading standards.  At oral argument, the Court repeatedly pressed Wollman on what facts he has alleged (or could allege if given leave to amend the Complaint) to support his claim.  He provided only two: (1) the SLC Report's investigative finding that the spread on the management fee (4% less a percentage paid to sub-

---

Manager.  Assuming that he could allege a direct claim with this new formulation, he has nonetheless failed to state a claim for fraud, as discussed below.

[12]    Because the parties agree that New York law governs Wollman's common-law fraud claim, the Court will evaluate his claim under that law.  *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.").  Moreover, there is no apparent conflict of law, and the alleged tortious acts against Wollman took place in New York, independently counseling in favor of applying New York law.  *See id.*; *Rodriguez*, 300 F.R.D. at 13.

managers) was a "deal term" favoring AR Capital, and (2) the SLC Report's finding that the Property Manager did not perform the services it was required to perform under the contract. *See* SLC Report at 55.

Neither fact remotely supports an inference that the 4% property management fee—fully disclosed in offering documents as a fee—was, in reality, an underwriting commission. A deal term is just that—consideration supporting the agreement. An underwriting commission, in contrast, is something far more specific: "remuneration . . . received by a distributor or dealer as a consequence of reselling securities bought from an underwriter or dealer at a price below the offering price of such securities." 17 C.F.R. § 260.3(4)-1(a). There are no facts pled, and none appear in the SLC Report, from which the Court can infer that any portion of the disclosed management fee was actually being paid to the Dealer-Manager as additional compensation for selling HIT securities. Wollman cannot transform a disclosed excessive management fee (which would support a derivative claim) into an undisclosed excessive underwriting commission (which would support a direct claim) simply by renaming it. Wollman's approach calls to mind a riddle attributed to Abraham Lincoln:[13] "If you call a tail a leg, how many legs does a dog have? Answer: Four. Calling a tail a leg does not make it a leg." So too here. Calling a management fee an underwriting commission does not make it an underwriting commission.

Wollman's second claim, in addition to being derivative, also fails to state a claim. Wollman argues that Defendants committed fraud because they did not disclose that the Massachusetts securities regulator was investigating and would file a complaint against the Dealer-Manager (and did so on the very day Wollman purchased his shares). Pl.'s Opp. at 14.

---

[13]     *See* William Safire, *Essay; Calling a Tail a Leg*, N.Y. Times (Feb. 22, 1993), https://www.nytimes.com/1993/02/22/opinion/essay-calling-a-tail-a-leg.html.

This argument fails for several reasons.  First, Wollman does not allege that Defendants knew RCS was being investigated, let alone that a complaint would be filed imminently; he argues the opposite—that several individual Defendants did not learn about the investigation until Massachusetts filed its complaint.[14]  *Id.* at 12.  He does not allege that the fact that Massachusetts had an investigation open on the Dealer-Manager would have been material to his decision to invest in HIT had he known.  He also does not allege that he was unaware of the investigation, which, according to the Defendants, had been made public a year earlier.  Nor, even when pressed during oral argument, did he advance any authority for the proposition that an issuer has an obligation to disclose that its third-party dealer-manager is under investigation by a state securities regulator for unrelated conduct, let alone authority that it would be fraud to fail to provide such disclosure.

Wollman's third claim is even less plausible.  The Complaint makes benign allegations that Wollman received dividends in the form of common stock at a price based on an estimated NAV in July 2016, and then HIT's NAV declined over the next three years.  In July 2016, because of financing issues, HIT decided to pay its dividend in shares rather than cash based on an estimated NAV per share of $21.48, and continued to pay a dividend based on that NAV going forward.  Compl. ¶ 46.  In January 2017 an investor acquired shares at $14.75.  *Id.* ¶ 48.  Six months later HIT estimated that the NAV for its common stock was $13.20 per share, and a year later estimated a NAV per share of $13.87.  *Id.* ¶¶ 49–50.  In May 2018 HIT issued a self-

---

[14]     Although Wollman melds the Massachusetts investigation with HIT's liquidity crises, the facts alleged suggest that the liquidity crises did not start with the actions of the Massachusetts regulator but, instead, began with the decision of Apollo Global Management LLC ("Apollo") to terminate its agreement to purchase 60% of AR Capital's assets.  *See* Compl. ¶ 40.  Although the Complaint alleges, *ipse dixit*, that Apollo's decision owed "at least in part" to the Massachusetts securities regulator's investigation of RCS, there is not a single fact alleged in the Complaint that supports that conclusory allegation.  The only facts alleged are that Apollo pulled out of the deal approximately a week before Massachusetts filed its complaint against RCS.  *Id*. at ¶ 39.  There is no allegation that Apollo knew or cared about the Massachusetts investigation when it decided to withdraw from the deal.

tender offer to purchase shares at $7.05 in response to a hostile tender offer; that was the first

chance Wollman had to sell his shares.  *Id.*  ¶ 51.  Finally, HIT disclosed a share price of $9.21 in

May 2019, and the shares listed on a secondary market at $5.00 in September 2019.  *Id.* ¶¶ 52–

53.  No inference that HIT misrepresented its NAV can be drawn from those allegations.  That

HIT turned out to be a bad investment does not suggest fraud.

Moreover, the Complaint fails to plead a strong inference of scienter.  Wollman must

allege with particularity either (a) facts "showing that the defendant had both motive and

opportunity to the commit fraud" or (b) facts "constituting strong circumstantial evidence of

conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

99 (2d Cir. 2007); *see also Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d

297, 306 (2d Cir. 2015) (listing possible circumstantial evidence).  Wollman argues that

individual Defendants must have known of the alleged fraud because of their positions at HIT,

because they were enmeshed in and willfully blind to the control asserted by the AR Parties, and

because they had a financial motive to defraud Wollman because of a 5% ownership interest in

the Property Manager.  Pl.'s Opp. at 17.  Those general allegations fall far short of raising an

inference of scienter.  A defendant's executive position, mere ownership stake, or goals

"possessed by virtually all corporate insiders" do not establish scienter.  *S. Cherry St., LLC v.

Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d

Cir. 2001).

## V.     Leave to Amend

As a general rule, a "court should freely give leave" to amend a complaint "when justice

so requires."  Fed. R. Civ. P. 15(a)(2).  "Notwithstanding the liberality of the general rule,

[w]hether to allow amendment is a decision that rests in the discretion of the district court."

*Lincoln v. Potter*, 418 F. Supp. 2d 443, 454 (S.D.N.Y. 2006) (quotation omitted).  Leave to

amend may be denied for good reason, including when amendment would be futile. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 308 (S.D.N.Y. 2019). "[W]here the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 44 (S.D.N.Y. 2016) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

At oral argument, Wollman was clear that he derives the factual predicate for the Complaint solely from the SLC Report. Indeed, Wollman attributes the two-year gap between understanding that he had a derivative claim (and making a demand to the Board based on that claim) and deciding that his claim could be reformulated as a direct claim for fraud to the recent publication of the SLC Report. Although he could not identify additional facts in the SLC Report to shore up his claims, he stated that he would find others if given the chance. But Wollman has had the SLC Report since October 2019 and represents that he has reviewed it thoroughly—he had ample incentive to do so given both the proceedings in this action and his objection to the settlement in the related *Milliken* action. His silence at oral argument was particularly telling in light of the skepticism the Court had expressed three days earlier during the *Milliken* settlement hearing. Giving Wollman leave to amend would be futile. Wollman could identify no factual allegations—in the Complaint or the SLC Report—at oral argument to support his bare assertions of fraud and the Court has found no support in the SLC Report for his

claims.  The Court has no reason to believe that Wollman can pull new allegations from the SLC

Report now.[15]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Complaint

is DISMISSED with prejudice.

The Clerk of Court is respectfully directed to close all open motions and close this case.


**SO ORDERED.**

**Date:  June 18, 2020**                                         **VALERIE CAPRONI**
**        New York, New York**                          **United States District Judge**

---

[15]       Giving Wollman leave to amend would also be unfair to the parties in the *Milliken* action.  The pending *Milliken* settlement understandably is conditioned on dismissal of Wollman's lawsuit.  The time it would take to file an amended complaint, brief a likely second motion to dismiss, and rule on that motion would prolong this case for months during a time when the COVID-19 pandemic has decimated the hotel industry.  Prompt resolution of the *Milliken* settlement will do justice to the parties and indirectly benefit both Wollman and HIT's other shareholders now.